HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICHAEL W. SHIPPEY, | |
| Plaintiff, | CASE NO. C12-225RAJ |
| v. | ORDER |
| JOHN LOVICK, in his capacity as Snohomish County Sheriff, et al., | |
| Defendants. | |

## I.  INTRODUCTION

This matter comes before the court on Defendants' motion for summary judgment. No party requested oral argument, and the court finds oral argument unnecessary. For the reasons stated herein, the court DENIES the motion. Dkt. # 18.

## II.  BACKGROUND

This case arises in the wake of an altercation between Plaintiff Michael Shippey and four deputies of the Snohomish County Sheriff's Department. The altercation began innocuously, with one deputy preparing to take Mr. Shippey into custody after he admitted that there was an outstanding warrant for his arrest. Once the deputy confirmed the existence of the warrant and began to effect the arrest, the situation deteriorated quickly. Accepting Mr. Shippey's version of events, he complied with the deputy's commands, did nothing to resist, and yet the deputy and another deputy on the scene repeatedly used a taser and other weapons on him. Two more deputies arrived later and

ORDER – 1

joined in beating him.  Accepting the deputies' version of events, Mr. Shippey attempted to flee and struggled mightily against the deputies' attempts to subdue him.  They used a taser and other weapons only in response to his assault, and additional deputies were necessary to ultimately subdue him.  Everyone agrees, however, that the altercation ended with Mr. Shippey no longer breathing.  The deputies performed first aid and summoned emergency medical personnel.  Mr. Shippey spent eight days in a medically-induced coma and spent nearly a month in the hospital.

Mr. Shippey has now sued the four deputies along with the Snohomish County Sheriff himself as well as the office that he heads.  His complaint is difficult to follow.  He points to a violation of 42 U.S.C. § 1983, Compl. (Dkt. # 4) at 4, which gives a plaintiff a cause of action against persons acting under color of state law when those persons violate his rights arising under the United States Constitution.  He alleges that the deputies used excessive force, presumably invoking the Fourth Amendment, but he also contends that the deputies' use of force violated Snohomish County Sheriff's policies.  *Id.*  He claims violations of his "Constitutional rights to life, liberty, and the pursuit of happiness," *id.*, even though those rights appear nowhere in the Constitution.  *But see* The Declaration of Independence, ¶ 2 (U.S. 1776) ("We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness.").  He cites violations of unspecified "Civil Rights." *Id.*  He also states a claim for outrage.  *Id.*

Defendants responded with a summary judgment motion that purported to dispose of the case in its entirety, but actually addressed only one issue: the four on-scene deputies' belief that they are entitled to qualified immunity for their use of force.

Plaintiff responded by claiming that the deputies used excessive force in violation of the Fourth Amendment, that they violated Article I, Section 7 of the Washington

ORDER – 2

Constitution (which is Washington's analogue to the Fourth Amendment), and that they violated Snohomish County use-of-force policies.

With this summary in mind, the court prefaces its more detailed consideration of the altercation between Mr. Shippey and the deputies by enumerating the issues that this order will not consider in detail.  It will not address Mr. Shippey's outrage claim, because Defendants do not address it.  It will not address Mr. Shippey's claim against the Sheriff and the Sheriff's office, because Defendants do not address it.  So far as the complaint and the remainder of the record reveal, the Sheriff and his office are being sued solely in their capacity as policymakers.  In that capacity, they cannot claim qualified immunity. *Owen v. City of Independence*, 445 U.S. 622, 638 (1980) (holding that local government units cannot invoke qualified immunity).[1]  The court will not consider Mr. Shippey's claim that the deputies violated Snohomish County policy, because he points to no law that allows him to sue for violations of County policy.  Finally, the court will not address Mr. Shippey's attempts to inject the Washington Constitution into this dispute, because unlike violations of the United States Constitution, which are remediable via § 1983, there is no cause of action for damages arising from violations of the Washington Constitution.  *Reid v. Pierce County*, 961 P.2d 333, 342-43 (Wash. 1988).

The court now turns to the sole issue that the summary judgment motion raises: whether the deputies are entitled to qualified immunity from Mr. Shippey's § 1983 claim based on allegations of excessive use of force in violation of the Fourth Amendment.

### III.  ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred*

---

[1] The court does not suggest that Mr. Shippey has a viable claim against the Sheriff or his office.  They can be liable for a County policy only if that policy was a moving force behind the constitutional violation that Mr. Shippey claims.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Mr. Shippey does not claim, however, that any Snohomish County policy caused him injury.  He alleges instead that the officers injured him by *violating* County policy.

ORDER – 3

1  *Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate
2  where there is no genuine issue of material fact and the moving party is entitled to a
3  judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party must initially show
4  the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,
5  323 (1986).  The opposing party must then show a genuine issue of fact for trial.
6  *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The
7  opposing party must present probative evidence to support its claim or defense.  *Intel
8  Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The
9  court defers to neither party in resolving purely legal questions.  *See Bendixen v.
10 Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

11 As noted, the deputies' summary judgment motion asserts qualified immunity, a
12 defense that protects § 1983 defendants "from liability for civil damages insofar as their
13 conduct does not violate clearly established statutory or constitutional rights of which a
14 reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).
15 A court considering a qualified immunity claim considers whether the plaintiff has
16 alleged (or provided some evidence for, depending on the stage of litigation) facts
17 establishing the violation of a constitutional right and whether that right was "clearly
18 established" at the time of the defendant's wrongful acts.  *Pearson v. Callahan*, 555 U.S.
19 223, 231 (2009).  A court has discretion to consider either portion of the qualified
20 immunity test first.  *Id.* at 236 (overruling *Saucier v. Katz*, 533 U.S. 194 (2001), which
21 had mandated that courts determine, for every assertion of qualified immunity, whether
22 plaintiff had alleged a violation of a constitutional right).

23 The Fourth Amendment prohibits "unreasonable searches and seizures," U.S.
24 Const. Amend. IV, and courts have developed an analysis to determine when the
25 quantum of force used to effect a seizure is excessive.  That analysis requires a court to
26 "careful[ly] balanc[e] . . . the nature and quality of the intrusion on the individual's

ORDER – 4

Fourth Amendment interests against the countervailing governmental interests at stake." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The court weighs the severity and duration of the force against government interests including the severity of the crime leading to the seizure, "whether the suspect posed an immediate threat to the safety of the officers or others," and "whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Mattos*, 661 F.3d at 441. These factors are not exclusive, and the court must ensure that it considers the totality of the circumstances relevant to the use of force. *Id.*

With that framework in mind, the court examines the altercation in detail. In doing so, the court relies largely on Mr. Shippey's declaration and the written and taped statements each deputy gave in an external law enforcement investigation of the incident. The court largely ignores the excerpts the parties submitted of the report that resulted from the investigation. The report is hearsay, and the excerpts in the record are not nearly as illuminating as the evidence that comes directly from Mr. Shippey and the deputies.

A. **The Parties Offer Competing Versions of the Altercation Between Mr. Shippey and the Deputies.**

No one disputes that in February 2009, Deputy Jay Ravenscraft encountered two men sitting in a parked pickup truck. For reasons that Dep. Ravenscraft himself does not reveal, he stopped his patrol car, exited, and approached the truck. He asked the two men if they had identification. The person in the driver's seat presented an identification card. Mr. Shippey, seated in the passenger seat, stated that he had no identification, but gave his full name and date of birth. Dep. Ravenscraft radioed dispatch to check both occupants' names, and waited at the pickup truck for a response.

While waiting, he asked both men if they had outstanding warrants. Mr. Shippey said that he did.

ORDER – 5

Dep. Ravenscraft states that Mr. Shippey "kept clenching his fists" while he was seated. Ravenscraft Decl., Ex. A at 1. He ordered him to place his hands on the dashboard. Mr. Shippey complied, at least initially. Dispatch confirmed that Mr. Shippey had a felony warrant for "Dangerous Drugs." *Id.* at 2. Dep. Ravenscraft radioed for backup to assist in taking Mr. Shippey into custody. After some time, Deputy Marc Monson arrived on the scene.

When Dep. Ravenscraft ordered Mr. Shippey to leave the vehicle, he noticed that his hands were no longer on the dashboard. Dep. Ravenscraft ordered Mr. Shippey to extend his right hand out of the window. Dep. Ravenscraft took his hand and placed it in an "escort position," which he described as twisting his wrist "in a manner which if he did anything funny [it] would be pretty easy to twist it and cause some pain . . . ." Ravenscraft Decl., Ex. A at 2, Ex. B at 5.

Here, the parties' accounts of the incident diverge sharply. Mr. Shippey declares that as he exited the vehicle, Dep. Ravenscraft twisted his left arm behind his back, pinned him against the truck, and someone shocked him with a taser on the base of his neck. Shippey Decl. ¶¶ 8-9. While he was still dazed, one of the deputies "slammed him to the ground." *Id.* ¶ 9. He felt the weight of more than one person on top of him, and was subject to "repetitive tasing." *Id.* He then blacked out, and remembers nothing until he awoke in the hospital eight days later. *Id.*

The deputies' account differs, to say the least. Dep. Ravenscraft and Dep. Monson say that Mr. Shippey exited the truck and "lunged" away. Ravenscraft Dep., Ex. A at 2, Monson Decl., Ex. A at 2. The deputies pinned him against the truck, but Mr. Shippey continued to struggle. Ravenscraft Dep., Ex. A at 2, Monson Decl., Ex. A at 2. Dep. Ravenscraft radioed for immediate assistance. Ravenscraft Dep., Ex. A at 3. Mr. Shippey seemed to be trying to reach inside his coat, which no one had searched for weapons. Monson Decl., Ex. A at 2. Dep. Monson unholstered his taser, threatened to

ORDER – 6

use it if Mr. Shippey did not stop struggling, then applied the taser once in "drive-stun" mode.[2] *Id.* Mr. Shippey collapsed to the ground. *Id.* He said that he could not breathe, but tried to get up. *Id.* Dep. Ravenscraft was attempting to get Mr. Shippey's hands behind his back, but he continued to struggle. *Id.* Dep. Monson threatened to use the taser again. *Id.* According to Dep. Monson, Mr. Shippey was able to lift him off the ground with one arm while fighting Dep. Ravenscraft with his other arm. *Id.* at 3. Dep. Monson applied the taser again in drive stun mode, but it had little impact. *Id.* Mr. Shippey apparently made his way to his feet, and the deputies tried to hold him against the truck. *Id.* At some point, Dep. Ravenscraft used a "LVNR technique," which is a type of choke hold. Ravenscraft Dep., Ex. A at 3. Mr. Shippey continued to resist, and "took several swings with his left arm" in Dep. Monson's direction. Monson Decl., Ex. A at 3. Dep. Monson kneed him at least twice. *Id.* He also used his taser in drive stun mode at least two more times. *Id.* When Mr. Shippey grabbed at his utility belt, which held a handgun and other weapons, Dep. Monson applied another drive stun shock to the back of Mr. Shippey's neck. *Id.* at 4. Mr. Shippey then grabbed Dep. Monson's taser, so Dep. Monson struck him in the head at least "several times." *Id.* The struggle continued in similar fashion. *Id.* at 4-5. Dep. Monson tased him at least one more time. *Id.* at 5. By this time, Dep. Monson noticed that Mr. Shippey's "face was turning a strange bluish purple color," although he continued to struggle. *Id.*

---

[2] Many law enforcement officers use tasers with both a "drive-stun" and "dart" mode. *Mattos*, 661 F.3d at 443. In dart mode, the weapon launches two "darts" connected to the taser by wires, both of which are intended to strike the target and deliver an electric shock. *Id.* In drive-stun mode, no projectile is launched, and the weapon is instead applied directly to a target's skin, where two electrodes on the weapon deliver a shock. *Id.* The parties' evidence surrounding the taser shocks in this case is muddled. Both Dep. Ravenscraft and Dep. Monson refer to seeing probes attached to Mr. Shippey's skin after using the taser in drive-stun mode. *E.g.*, Monson Decl., Ex. A at 2. It is possible that Dep. Monson used the taser in dart mode, but at very close range. And although the deputies do not expressly admit to using a taser in dart mode, their counsel concedes that they did so at least once. The court need not resolve this issue to reach a decision today. Should the parties revisit the issue, the court expects them to do a substantially better job pointing to specific, admissible evidence that explains the nature of the taser shocks at issue here.

ORDER – 7

Deputy James Chelin and Sergeant Craig White arrived on the scene.  Dep. Chelin joined in the effort to restrain Mr. Shippey, without success.  *Id.* at 5.  Dep. Chelin then used his taser on Mr. Shippey.  *Id.*  Sgt. White hit him at least once in the legs with a baton.  *Id.*  Eventually, the deputies were able to handcuff Mr. Shippey.  *Id.*

It was about five seconds after the deputies handcuffed Mr. Shippey that they noticed that he did not appear to be breathing.  Monson Decl., Ex. A at 5.  The deputies administered CPR and revived him.  White Decl., Ex. A at 2-3.  Emergency medical personnel arrived and transported Mr. Shippey to a hospital.

Mr. Shippey spent nearly a month in the hospital.  Shippey Decl. ¶ 10.  He spent the first eight days of his stay in a medically-induced coma.  *Id.*  He had extensive bruising over the back of his legs.  *Id.*  The medical records show that he "basically suffered a cardiac arrest," that he had "severe bruising throughout his whole lower extremities on both sides," he had rhabdomyolysis ("basically broke-down muscles") and "acute tubular necrosis and acute renal failure" as a result of the altercation.  Seder Decl., Ex. C.

**B.    Construing the Evidence in the Light Most Favorable to Mr. Shippey, the Deputies Used Excessive Force in Violation of the Fourth Amendment.**

The court has no choice, on a motion for summary judgment, but to accept Mr. Shippey's account of events.  By that account, Dep. Ravenscraft and Dep. Monson used a taser to incapacitate a man who complied with their commands and was in the process of submitting to a custodial arrest.  They continued to use force, including additional taser jolts, even after Mr. Shippey was on the ground.  The court need not conduct an in-depth balancing of factors relevant to the excessive force inquiry:  repeated blows, repeated use of a taser, and repeated use of impact weapons (with a cumulative impact sufficient to cause renal failure) on a passive arrestee is plainly a violation of the Fourth Amendment.  If the court were permitted to accept the deputies' account of events, the result would be

ORDER – 8

different.  Taking the admissible evidence in the light most favorable to Mr. Shippey, however, the deputies used excessive force.

Accepting Mr. Shippey's version of events, the deputies fare no better on the second prong of their qualified immunity defense: whether they violated "clearly established" law.  No reasonable deputy could have believed it was appropriate to apply the quantum of force used here against a man who did not resist arrest.  Summary judgment is not appropriate.

## IV.  CONCLUSION

For the reasons previously stated,[3] the court DENIES Defendant's motion for summary judgment.  Dkt. # 18.

DATED this 18th day of March, 2013.

*Richard A. Jones*

The Honorable Richard A. Jones
United States District Court Judge

---

[3] The court's analysis today does not mention a host of irrelevant assertions from Mr. Shippey's counsel.  It makes no difference that prosecutors ultimately dismissed the charge underlying Mr. Shippey's warrant or that they declined to charge Mr. Shippey with assault following the altercation.  It also makes no difference that some of the deputies have been involved in other use-of-force incidents, particularly when there is no evidence that any of them has a pattern of doing anything more culpable than failing to complete necessary paperwork following those incidents.  The court also observes that Mr. Shippey's counsel cited evidence in a manner that made it almost impossible to locate the evidence corresponding to the citation.

ORDER – 9